**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GRACE WILSON,
Plaintiff-Appellant,

v.

No. 95-1831

SOUTHERN NATIONAL BANK OF NORTH
CAROLINA,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-93-274-3-P)

Submitted: May 7, 1996

Decided: August 8, 1996

Before WIDENER, MURNAGHAN, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Shelley Blum, Charlotte, North Carolina, for Appellant. Philip M.
Van Hoy, VAN HOY, REUTLINGER & TAYLOR, Charlotte, North
Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

**OPINION**

PER CURIAM:

Grace Wilson appeals the district court's order granting summary judgment to Appellee Southern National Bank of North Carolina ("the Bank") in this action alleging employment discrimination based upon sexual harassment. Because we find no reversible error, we affirm.

Wilson filed a complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e (West 1994), against her former employer, the Bank. Wilson was employed at the Bank from March 13, 1991, until June 17, 1993. The complaint alleged that a male co-worker sexually harassed Wilson and that the Bank retaliated against her when she reported some of the alleged harassing incidents to her supervisor. The complaint also included a state law claim for intentional infliction of emotional distress.

The Bank moved for summary judgment. Wilson belatedly opposed that motion and filed her own motion for summary judgment without supporting depositions. The district court granted summary judgment to the Bank. Wilson timely appealed.

I.

Wilson and the Bank have very different accounts of what happened in the workplace. However, because Wilson did not provide supporting depositions with her motion for summary judgment, the district court relied on the portions of her deposition submitted by the Bank and also on the unopposed depositions filed by the Bank. We briefly detail the alleged events below.

A. The Hand-on-Hip and Rubber Band Incidents

Wilson alleged that in October or November 1991, Eric Wright, a co-worker in her department, put his hand on Wilson's hip, licked his lips, and said: "umm . . . I'd like to have some of that." Wilson turned around and told Wright to keep his hands off of her. Wright then threw his hands up in a surrendering motion and said, "oh, oh, oh."

2

The alleged incident occurred in the workplace. Later that day, Wilson told Wright that she did not want anyone to touch her and asked him not to do it again. Wright responded, "okay, okay, okay." Wilson did not report the incident to a supervisor at the time. Wright never did this to Wilson again. Later in the week, Wright shot Wilson in the hip with as many as three rubber bands. Wilson returned fire with a rubber band. Other workers, all female, also shot rubber bands.

About a week after the hand-on-hip incident, Wilson complained about that incident and the rubber band incident to her department supervisor, Richard Burch. Within four days of receiving Wilson's complaint, Burch sent a memo and held a meeting (with Wright present) where he told the department employees that they should act in a professional manner at work.

B. The Hiked Pants, Dirty Cartoons,
and "Older Women" Incidents

Wilson alleged that, after the above meeting with Burch, Wright would "yank up his pants as high as he could get them so that [the outline of] his genitals would show and then he would get in front of your face." Wilson stated in her complaint that this occurred on several occasions. In her deposition, however, Wilson stated that the behavior occurred "25 to 30 times." Wilson would turn away and ask Wright to stop. Wilson never reported this alleged behavior to any member of management.

Wilson also alleged that, after the meeting with Burch, some of her co-workers would show her "dirty cartoons." Wright brought in one of these cartoons, but a majority of them were brought in by a female co-worker. The department's employees, both male and female, generally laughed and joked about the cartoons. When Wright showed Wilson a cartoon, she turned away. When a female co-worker showed Wilson a cartoon, she said she did not want to see it. Burch saw a cartoon and appeared to think it was funny. Wilson never reported the cartoon incidents to management.

Wilson further alleged that Wright, who is half Wilson's age, told Wilson twice that he preferred older women. Wilson never reported this incident to management.

3

C. The Clipboard Incident

Wilson alleged that on June 22, 1992, Wright "finished a session of holding up his pants, . . ." while singing a song "about hips and butts and things like that." Then, as Wilson was leaning over an office machine that had jammed, Wright "whacked" her in the hip with a clipboard. The whack "felt like bee stings" and Wilson was "stunned," "fell into the machine," "saw stars," and "had tears running from [her] eyes." Other co-workers, mostly female, were present. Wilson alleged that she could hear people laughing.

Wilson sought medical treatment about a week later, but did not see a doctor because she did not have a workers' compensation report and did not want to pay the doctor herself. Wilson eventually saw a doctor six or seven weeks after the clipboard incident.

When the clipboard incident originally occurred, Wilson did not report it to management because Burch was out of town. Wilson subsequently reported the incident to Burch. Wilson tried three times to relate the incident to Burch's supervisor, Sheila Ezell, but was unable to contact her. At Burch's recommendation, Wilson told Renita Barton, an Affirmative Action Coordinator in the Bank's Personnel Department, that "[she] had been hit [and she] had a bruise on [her] hip." Barton asked if Wilson wanted to file a workers' compensation claim, but Wilson declined at that time. Burch called Wright into his office and told him that "in no circumstances should [he] ever touch another employee, and that there certainly shouldn't be any hitting of another employee." Burch warned Wright that actions of that sort could lead to Wright losing his job.

After the alleged clipboard incident, Wilson felt that a female co-worker and Wright were teasing her because she complained to management. In response to Wilson's concerns, Burch transferred Wilson to another department where she worked in a separate room with only one other person. Wilson also received a raise as a result of the transfer. Wilson was "overjoyed" and "really appreciated" the transfer. After the transfer, Tish Jones, a female co-worker,"would come to the door, shut the door behind her and ask [Wilson] what [she] was doing" and why she would not talk to Wright or Jones. Jones would also "get closer and closer to" Wilson until Wilson "would get up,

4

open the door and leave." Wright would do the same thing sometimes and lean over Wilson. Burch told Jones and Wright to leave Wilson alone. Wright then only entered Wilson's office once more for a business purpose. When Jones continued to bother Wilson, Burch instructed her to leave Wilson alone.

At some point Burch told Wilson that she was too slow and needed to pick up the pace of her work. Wilson admits that she was not keeping up with her work. Wilson resigned from her position by giving two weeks notice. The first week of her notice she spent on vacation. When she returned for her second and final week, Wilson took a sick day, but ran into another employee of the Defendant when she was out shopping. Wilson was fired, but was paid for the second week.

II.

We review the district court's award of summary judgment de novo. Higgins v. E.I. Du Pont de Nemours & Co. , 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). In ruling on a motion for summary judgment, we must assess the evidence in the light most favorable to the non-moving party. Charbonnages de France v. Smith , 597 F.2d 406, 414 (4th Cir. 1979). Although summary judgment disposition should be used sparingly in employment discrimination cases, it is appropriate where there is no genuine dispute of material fact. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1004-05 (4th Cir.), cert. denied, 484 U.S. 897 (1987).

A. Sexual Harassment

To prove a hostile work environment claim under Title VII, a plaintiff must show that the conduct in question was unwelcome, that the harassment was based on sex, and that the harassment was sufficiently severe or pervasive to create an abusive working environment, and that some basis exists for imputing liability to the employer. Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir. 1989); Swentek v. USAIR, Inc., 830 F.2d 552, 557 (4th Cir. 1987). For sexual harassment to be actionable, it must be sufficiently severe or pervasive to

5

alter the conditions of employment and create an abusive working environment. Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 67 (1986).

We find that the district court properly concluded that, with the possible exception of the rubber band incident (in which Wilson participated), the conduct complained of was unwelcome. When Wright put his hand on Wilson's hip, she told him to keep his hands off her. When Wilson was shown a cartoon or when Wright hiked his pants, Wilson turned away. Finally, the clipboard incident caused Wilson physical pain. Thus, the district court correctly found that Wilson had demonstrated that the conduct she complained of was unwelcome.

The district court next concluded that, accepting as true Wilson's version of events, the alleged conduct could reasonably be found to have been based on sex. Specifically, the court found that the hand-on-hip, hiked pants, and cartoon incidents had sexual overtones. Further, the district court found that the "older women," rubber band, and clipboard incidents, when viewed in context with the other incidents, could reasonably be seen as based on sex. Accordingly, the district court properly found that Wilson met the second element by showing that the alleged behavior was based on sex.

The district court then concluded that the alleged conduct could reasonably be found to be severe or pervasive. The court reasoned that the alleged conduct was more than an isolated incident (making it possibly pervasive) and involved physical contact (making it possibly severe). Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991); Paroline v. Unisys Corp., 879 F.2d at 105. Thus, the court found that the alleged conduct was sufficiently severe or pervasive to be actionable; accordingly, Wilson met the third element of sexual harassment.

As to the fourth factor, the district court correctly found that no basis existed for holding the Bank liable for any harassing behavior engaged in by its employees. An employer is liable for an employee's sexual harassment of another worker if the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action. Paroline, 879 F.2d at 106. Wilson's testimony reveals that she never informed Bank managers about the hiked pants, cartoon, or older

6

women incidents. Thus, the Bank had no actual knowledge of any hostile work environment which may have arisen from these incidents. Moreover, these incidents were not so pervasive or obvious as to give the Bank constructive knowledge of the alleged harassment, and the district court correctly so held.

Wilson did complain to management about the hand-on-hip, rubber band, and clipboard incidents; thus, the Bank had actual knowledge of any hostile work environment that may have arisen out of those incidents. The record reveals, however, and the district court correctly noted, that when the Bank learned of these incidents, it did not "acquiesce in a practice of sexual harassment." Katz v. Dole, 709 F.2d 251, 254 (4th Cir. 1983). Rather, the Bank took prompt remedial action that was reasonably calculated to end the harassment. Katz, 709 F.2d at 256. Wilson's testimony reveals that within four days of her complaint to Burch about the hand-on-hip and rubber band incidents, Burch convened a meeting of the department and distributed a memo regarding the need for employees to act in a professional manner. Following that meeting, there were no more such incidents. Thus, the district court properly found that no reasonable fact finder could find that the Bank did not take prompt remedial action.

As to the clipboard incident, Wilson waited a week to report the incident. When she did report it, the incident was referred to the Personnel department. Burch counseled Wright that he should never touch or hit another employee, and warned Wright that his behavior could lead to termination. Further, the Bank transferred Wilson to another department with a raise to separate her from her alleged harasser. Wilson welcomed the transfer. When Wright continued to bother Wilson in a non-sexual manner in her new work area, he was warned to stay away from her and leave her alone. Wright never bothered Wilson again.

Based on the above prompt remedial action taken by the Bank in response to Wilson's complaints, we find that the district court properly found that Wilson failed to establish that the Bank is liable for any hostile work environment which may have been created by the actions of a co-worker. Wilson simply failed to offer evidence that the Bank acquiesced in a practice of sexual harassment. Accordingly, the

7

district court properly granted summary judgment to the Bank on Wilson's sexual harassment claim.

B. Retaliation

An employer may not discriminate against an employee in retaliation for that employee's opposition to, or complaint about, an unlawful employment practice. 42 U.S.C. § 2000e-3. Wilson alleged that the Bank retaliated against her in violation of that provision because the Bank's employees responded to her complaints of sexual harassment in a demeaning, disrespectful, and emotionally destructive manner. Wilson alleged that the Bank purposely responded in this manner in retaliation for Wilson's complaints. Further, Wilson alleged the Bank ratified the hostile work environment and failed to protect her from further harassment, which caused her to resign.

To prevail on a claim of retaliation, Wilson must show that she engaged in protected activity, that the employer took adverse employment action against her, and that a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). The district court correctly found that Wilson engaged in protected activity by complaining to management about Wright's actions. However, the Bank did not take adverse employment action against Wilson. Wilson asserted that the Bank's alleged failure to protect her from retaliatory teasing by Wright satisfies the adverse employment action element of her retaliation claim. However, the record demonstrates that the Bank took prompt remedial action reasonably calculated to end the alleged retaliatory harassment by Wright and Jones. Thus, Wilson cannot establish the second element of her retaliation claim.

Moreover, the district court correctly noted that Wilson complained only of retaliation by her co-workers. Wilson did not allege that management took any direct retaliatory action against her, such as her transfer or discharge. In any event, the district court properly found that the Bank offered ample evidence showing that Wilson's transfer was not retaliatory, but was welcomed by Wilson and accompanied by a pay raise. Finally, the undisputed evidence showed that Wilson was discharged during her last week for good cause-- she was seen shopping on a day when she had called in sick to work. Thus, the dis-

8

trict court properly granted summary judgment to the Bank on this claim.

C. Intentional Infliction of Emotional Distress

Wilson's complaint included a state law claim for intentional infliction of emotional distress. To prevail on such a claim, Wilson must show that the Bank engaged in extreme and outrageous conduct, that the conduct was intended to cause severe emotional distress, and that the conduct in fact caused severe emotional distress. Waddle v. Sparks, 414 S.E.2d 22 (N.C. 1992). Rarely will conduct in the employment context rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress. Cox v. Keystone Carbon, 861 F.2d 390, 395 (3d Cir. 1988), cert. denied, 498 U.S. 811 (1990).

Wilson's complaint merely asserts that the Bank's response to her complaints of sexual harassment was performed "intentionally and with reckless indifference to the consequences to the Plaintiff." Wilson further alleged that "the conduct alleged did in fact cause severe emotional distress to the Plaintiff." However, Wilson failed to offer any evidence of a severe or disabling emotional or mental condition, as required to prevail on such a claim. See Waddle v. Sparks, 414 S.E.2d at 27 (defining "severe emotional distress" as including neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so). In fact, the medical doctors who treated Wilson both concluded that Wilson has no permanent disability, either physical or mental, and that she suffered from "tremendous symptom magnification and fixation." Thus, the district court properly granted summary judgment to the Bank on this claim.

For the reasons set forth above, we affirm the district court's order granting summary judgment to the Bank. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

9